Duo-Fast Carolinas, Inc. v. Scott's Hill Hardware & Supply Co., 2018 NCBC 2.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| COUNTY OF WAKE | 16 CVS 9343 |

| | |
|---|---|
| DUO-FAST CAROLINAS, INC., <br><br> Plaintiff, <br><br> v. <br><br> SCOTT'S HILL HARDWARE & SUPPLY CO., INC. and EDWIN MEDERO, <br><br> Defendants. | **ORDER AND OPINION ON PARTIES' MOTIONS FOR SUMMARY JUDGMENT** |

THIS MATTER comes before the Court on Defendant Scott's Hill Hardware's Motion for Summary Judgment (ECF. No. 46, "Scott's Hill's Motion"), Defendant Medero's Motion for Summary Judgment (ECF. No. 49, "Medero's Motion"), and Plaintiff's Motion for Partial Summary Judgment (ECF. No. 56, "Plaintiff's Motion"), (collectively, "Motions") pursuant to Rule 56 of the North Carolina Rules of Civil Procedure ("Rule(s)").

THE COURT, after considering the Motions, the briefs in support and in opposition to the Motions, the evidentiary materials filed by the parties, the arguments of counsel at the hearing, and other appropriate matters of record, concludes that Scott's Hill's Motion is GRANTED, Plaintiff's Motion is DENIED, and Medero's Motion is GRANTED, for the reasons set forth below.

> *Harris Sarratt & Hodges, LLP by Donald J. Harris for Plaintiff Duo-Fast Carolinas, Inc.*
>
> *Crossley McIntosh Collier Hanley & Edes, PLLC by Norwood P. Blanchard, III for Defendant Scott's Hill Hardware & Supply Co., Inc.*

*Law Office of Faith Herndon by Faith Herndon for Defendant Edwin Medero.*

McGuire, Judge.

FACTS

1.     Plaintiff is a North Carolina corporation with its principal place of business in Charlotte, Mecklenburg County, North Carolina. Plaintiff supplies "fasteners, pneumatic tools, nails, staples, and other commercial, residential and industrial building materials to its customers" and also services certain tools. (Ver. Compl., ECF No. 1 at ¶ 7.) As relevant to the Motions, Plaintiff sells its products "direct[ly] to construction companies, small framers, roofing companies, siding companies, [and] remodelers . . . ." (*Id.* at ¶ 10.)

2.     Defendant Edwin Medero ("Medero") is a former employee of Plaintiff. Medero first worked for Plaintiff in Charlotte, North Carolina from March 2010 to February 2013, at which time he resigned for personal reasons. (*Id.* at ¶ 18.) Plaintiff rehired Medero on September 9, 2013 as an outside sales representative assigned to Plaintiff's store in Raleigh, North Carolina. (*Id.* at ¶ 19.)

3.     Defendant Scott's Hill Hardware & Supply Co., Inc. ("Scott's Hill") is a North Carolina corporation with its principal place of business in Wilmington, New Hanover County, North Carolina. Scott's Hill is a "direct competitor" of Plaintiff. (ECF No. 1 at ¶ 2.)

4. On September 25, 2013, Medero and Plaintiff executed an Employment and Non-Compete Agreement with an effective date of September 9, 2013.[1] ("Employment Agreement"; ECF No. 1.4; K. Trippie Aff., ECF No. 18 at ¶¶ 11–12.) The Employment Agreement contains a section titled "Covenant Not to Compete" that provides, in relevant part, as follows:

> Employee covenants and agrees that he will not, either directly or indirectly, compete with the Company in the following areas: … Within a twenty five (25) mile radius of any customer location where the Employer performed services during the term of this Agreement; [ ] Within a twenty-five (25) mile radius of any customer location where the Employee performed services for the Employer and/or solicited business on behalf of the Employer during the term of this Agreement. . . .
>
> The term "compete" shall mean: . . . engaging in any business that is in competition with Employer in a manner which is competitive with Employer's business; . . .
>
> The words "directly or indirectly" as they modify the word "compete" shall mean: acting as an individual, consultant, advisor, officer, owner, member, manager, director, shareholder, principal, independent contractor, employee or in any other capacity whatsoever . . . .

(ECF No. 1.4 at §§ 6(e) and (f), 7(b)(iv).)

5. The Employment Agreement also contains a section titled "Nondisclosure of Information" that provides, in relevant part, that:

> Employee expressly covenants and agrees that he will not at any time during or after the termination of his employment with the Employer, reveal, divulge, sell, give or make known to any person, firm or corporation the

[1] Medero does not challenge the enforceability of the Employment Agreement on grounds of lack of consideration. Medero concedes that Plaintiff advised him that it would require him to sign a non-compete agreement prior to his hiring in September 2013. (Medero Aff. (10/10/16), ECF No. 21 at ¶ 3.)

contents of any customer lists, methods, or processes or any secret or confidential information whatsoever, now or hereafter used or owner(d) by Employer. . . .

Employee shall not, directly or indirectly, use or disclose for Employee's own benefits or for the benefit of another or to the detriment of the Employer any of the Employer's Trade Secrets or confidential and proprietary information, . . .

Trade Secrets and confidential or proprietary information include, but are not limited to, the Employer's customer and client lists; . . . or other documents or information contained on any computer hardware or software, that are made or compiled by Employee and/or Employer or which were available to Employee while employed with Employer concerning any customer and customer list . . . .

(*Id.* at § 9(a), (b), and (c); "non-disclosure provisions".) The non-disclosure provisions are not bounded by any time or geographic limits.

6.      Medero also signed a separate non-disclosure agreement ("NDA") with Plaintiff acknowledging that he would "honor the [Employment] Agreement" and would "not disclose any confidential information" to parties who were not authorized to receive such information. (ECF No. 1.1.) The NDA also states that "[a]ll information of a confidential nature will be returned upon request . . . or at the time of [Medero's] separation from employment" and that Medero would "not keep any duplicates in any form of any confidential information." (*Id.*)

7.      As an outside sales representative, Medero was responsible for selling Plaintiff's products in and around the Raleigh, North Carolina area. Plaintiff and Medero dispute the precise nature of Medero's duties. Plaintiff has provided affidavit evidence that Medero was given responsibility for some existing accounts and also

was responsible for generating new customers. (ECF No. 18 at ¶ 9.) Medero contends that Plaintiff did not provide him with any customers, and that he "had to build up [his] own customers." (ECF No. 21 at ¶ 6.) Plaintiff and Medero, however, agree that the primary method by which Medero acquired new customers was by visiting construction job sites in the Raleigh area to solicit contractors. (ECF No. 18 at ¶¶ 9, 15; ECF No. 21 at ¶ 6.) Medero described the methods he used to find new customers for Plaintiff's products as follows:

> I did that mainly by identifying and visiting construction sites where contractors were building in the Raleigh area. I used different websites to do this, such as one that showed lists of where building permits were being issued,[2] then driving to the sites, talking to the workers on the jobs to see what supplies they needed, getting them to identify who made purchasing decisions, and offering to sell Duo-Fast products. I did internet searches of different kinds of construction companies (framers, siders, and so on) in the Raleigh area, and would get names and contact information that way. I spent most of my time driving around and would come upon construction sites, and potential customers, that way. Sometimes friends, vendors or even Duo-Fast's own suppliers would pass on potential customers. In order to find out what customers' purchasing needs were, I would simply ask them, since what they needed would vary according to the job.

(ECF No. 21 at ¶ 6.) Plaintiff did not provide training to Medero on methods for finding new customers. Rather, Medero developed his approach to finding new customers based on "common sense." (*Id.*)

---

[2] The Court notes that Medero contradicted this statement in his deposition testimony, stating that he did not use the Internet to find the locations of construction projects. (Medero Dep., ECF No. 67.1 at p. 67.)

8.      Medero gave the contact information for new customers to Plaintiff's Raleigh store manager, who entered them into Plaintiff's computer system. (*Id.* at ¶ 7.) Plaintiff provided Medero with an iPhone and a laptop, and Medero stored customer contact information on the iPhone's Outlook contacts application. (*Id.* at ¶ 8; Medero Dep., ECF No. 55.8 at pp. 54–55.) Plaintiff did not instruct Medero to store customer contact information so as to ensure its confidentiality. (ECF No. 21 at ¶ 7.)

9.      Medero installed his personal Yahoo email application, which contained his personal emails and contacts, on the iPhone. (ECF 55.8 at p. 62.) He also used his wife's personal iPhone for work for a period of time while his company iPhone was damaged. (*Id.* at pp. 56.) While using his wife's iPhone, Medero downloaded the Outlook contacts from his company iPhone to his wife's phone. (*Id.* at pp. 56–57.) Some of the customer contact information from the iPhone Outlook contacts migrated to Medero's personal Yahoo contacts list, but Medero claims that he does not know exactly how this happened. (*Id.* at pp. 62–63.)

10.      Plaintiff alleges that its "confidential business information and trade secrets include," *inter alia*, "customer names and contact information." (ECF No. 1 at ¶ 15.) Plaintiff also generally alleges that it "maintains its confidential business information and trade secrets on a company computer system" and that it "strictly limits access to" its computer-stored data and information to employees who had an "absolute need to know" such information. (*Id.* at ¶ 16.) Plaintiff requires all

employees to sign the Employment Agreement and the NDA. (*Id*. at ¶ 17; ECF No. 18 at ¶¶ 4–5.)

11.    Medero, on the other hand, contends that "[n]o one at [Plaintiff] ever treated customer contact information as confidential or secret" and that Plaintiff did not tell Medero that he "needed to be careful with the name and contact information for customers." (ECF No. 21 at ¶ 7.)

12.    Plaintiff terminated Medero's employment on April 18, 2016. (ECF No. 21 at ¶ 9.) Medero returned to Plaintiff the company property it had issued to him, including pricing books, the iPhone, and the laptop computer. (*Id*.) Medero did not remove any customer contact or other business information that was stored on the iPhone or the laptop. (*Id*.)

13.    After his termination, Medero retained the names and contact information for the customers he serviced with Plaintiff that had migrated to his personal Yahoo contacts list. (*Id*.; ECF No. 55.3 at Interrog. 4.) Medero did not delete the customer names and contact information. (ECF No. 21 at ¶ 10.) Plaintiff apparently did not learn that Medero had retained this information until after filing this lawsuit. During discovery, Medero produced a list of the customer names and contact information that he retained in his Yahoo contacts list. (ECF Nos. 58 and 59.)

14.    Scott's Hill hired Medero in May, 2016 as an outside sales representative in the Raleigh area. (ECF No. 21 at ¶ 11; J. Barnhill Aff., ECF No. 23 at ¶¶ 4–5.) Medero's duties with Scott's Hill were nearly identical to his duties with Plaintiff. Medero sold Scott's Hill's products to construction contractors in the Raleigh

area. Medero found new customers for Scott's Hill by identifying and driving to construction sites, as he had done when he worked for Plaintiff. (Medero Aff. (8/14/17), ECF No. 50.5 at ¶ 5.)

15. Scott's Hill did not ask Medero to identify the customers he serviced while employed with Plaintiff, and Medero did not disclose the names and contact information to Scott's Hill. (ECF No. 21 at ¶ 11.) Nevertheless, it is undisputed that Scott's Hill, through Medero, sold products to some of the customers Medero serviced while employed with Plaintiff. (Scott's Hill's Resp. to Pl.'s First Interrogs., ECF No. 55.1 at Interrog. No. 13.) Medero admits he used information in his personal Yahoo contacts list "to contact a small number of [Plaintiff's] customers about doing business with Scott's Hill." (Medero's Answers to Pl.'s First Interrogs., ECF 55.3 at Interrog. No. 6; Medero's Second Suppl. Answers to Pl.'s First Interrogs., ECF No. 55.4 at Interrog. No. 11.) Medero claims that he has run into the vast majority of his former customers by traveling to job sites on behalf of Scott's Hill and has only used his personal contacts information to contact "about five" of Plaintiff's customers. (ECF No. 21 at ¶¶ 11–12.)

16. Plaintiff learned Medero was working for Scott's Hill in May 2016. On May 19, 2016, Mary Nelson ("Nelson"), the Director of Human Resources for Southern Carlson (Plaintiff's parent company), sent a letter to Medero regarding his post-employment obligations and the non-compete and nondisclosure provisions of the Employment Agreement. (ECF No. 1 at ¶ 43; ECF No. 1.3.) Nelson also sent a letter to John Barnhill ("Barnhill"), President of Scott's Hill, notifying Barnhill that Medero

was subject to "restrictions on his post-employment activities and … obligations regarding confidentiality and non-disclosure of proprietary information." (ECF No. 1 at ¶ 44; ECF No. 1.6.) The letter to Barnhill quoted the non-compete and nondisclosure provisions in Medero's Employment Agreement and stated that "any solicitation of [Plaintiff's] customers as provided in the Agreement will be presumed to be initiated [by] or with the assistance of Mr. Medero and result in legal action." (ECF No. 1.6.) Barnhill concedes that he received Nelson's letter but states that he had no discussion with Medero about the letter. (Barnhill Dep., ECF No. 55.7 at p. 91.) Neither Medero nor Barnhill responded to Nelson's letters. (ECF No. 1 at ¶ 46.)

17. Plaintiff subsequently learned that Medero was contacting some of Plaintiff's customers to solicit their business. (ECF No. 1 at ¶ 47.) On June 16, 2016, counsel for Plaintiff sent Medero and Barnhill letters notifying them that Plaintiff considered Medero in breach of the post-employment restrictions in the Employment Agreement and stating that by contacting Plaintiff's current customers, Medero was violating his Employment Agreement and NDA. (ECF No. 1 at ¶¶ 48–49; ECF Nos. 1.5 and 1.7.) Counsel demanded, *inter alia*, that Medero return any of Plaintiff's property still in his possession; that Medero and Scott's Hill identify all of Plaintiff's customers that Medero had contacted while working for Scott's Hill; and that Medero and Scott's Hill provide written acknowledgement that Medero was bound by the agreements he signed while employed by Plaintiff and that Scott's Hill would take active measures to prevent Medero from breaching those agreements. (*Id.*) Neither Medero nor Barnhill responded to the letters. (ECF No. 1 at ¶ 51.)

PROCEDURAL BACKGROUND

18. On July 22, 2016, Plaintiff filed this lawsuit in Wake County Superior Court. The Verified Complaint contains the following claims: motion for preliminary and permanent injunctions (First Claim for Relief); misappropriation of trade secrets in violation of the North Carolina Trade Secret Protection Act ("NCTSPA"), N.C. Gen. Stat. §§ 66-152 et seq. (hereinafter "G.S.") (Second Claim for Relief); breach of the Employment Agreement and the NDA against Medero only (Third Claim for Relief); conspiracy (Fourth Claim for Relief); tortious interference with contract against Scott's Hill only (Fifth Claim for Relief); conversion (Sixth Claim for Relief); unjust enrichment (Seventh Claim for Relief); unfair and deceptive trade practices (Eighth Claim for Relief); and punitive damages (Ninth Claim for Relief). (ECF No. 1 at ¶¶ 54–120.)

19. On July 25, 2016, this case was designated a mandatory complex business case by Order of the Chief Justice of the North Carolina Supreme Court and on the same day was assigned to the undersigned Special Superior Court Judge for Complex Business Cases by Order of Chief Judge James L. Gale. (ECF Nos. 6 and 7.)

20. On October 4, 2016, Plaintiff filed a Memorandum in Support of Motion for Preliminary Injunction (ECF No. 17) and evidentiary materials in support of the Motion for Preliminary Injunction. Defendants filed briefs and evidentiary materials in opposition to the motion, and on October 13, 2016, the Court held a hearing. On November 28, 2016, the Court issued an order denying Plaintiff's Motion for Preliminary Injunction. (ECF No. 28.)

21.     On August 15, 2017, the parties filed the Motions. Scott's Hill and Medero seek summary judgment as to each of Plaintiff's claims alleged against them. Plaintiff seeks partial summary judgment solely on the claim that Medero breached the non-disclosure provisions contained in the Employment Agreement. (ECF No. 56.) The Motions are fully briefed, and the court held a hearing on the Motions on October 13, 2017. The Motions are now ripe for determination.

ANALYSIS

A.     *Summary Judgment Standard*

22.     "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that any party is entitled to judgment as a matter of law." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012). An issue is "material" if "resolution of the issue is so essential that the party against whom it is resolved may not prevail." *McNair v. Boyette*, 282 N.C. 230, 235, 192 S.E.2d 457, 460 (1972). The moving party bears "the burden of clearly establishing lack of a triable issue to the trial court." *N.C. Farm Bureau Mut. Ins. Co. v. Sadler*, 365 N.C. 178, 182, 711 S.E.2d 114, 116 (2011) (quotation marks omitted). The moving party may meet this burden by "proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would have been barred by an affirmative defense." *Variety Wholesalers, Inc.*, 365 N.C. at 523, 723 S.E.2d at 747. In considering a motion for summary judgment, all evidence is viewed in the light most favorable to the

nonmoving party with the benefit of all reasonable inferences. *Bruce-Terminix Co. v. Zurich Ins. Co.*, 130 N.C. App. 729, 733, 504 S.E.2d 574, 577 (1998).

23. "If the movant demonstrates the lack of a genuine issue of material fact, the burden shifts to the non-movant to present specific facts which establish the presence of a genuine factual dispute for trial." *In re Will of Jones*, 362 N.C. 569, 573 669 S.E.2d 572, 576 (2008) (citing *Lowe v. Bradford*, 305 N.C. 366, 369–70, 289 S.E.2d 363, 366 (1982)). In determining whether the non-movant has met its burden, the judge "unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict . . . ." *Sloan v. Miller Bldg. Corp.*, 119 N.C. App. 162, 165-66, 458 S.E.2d 30, 32 (1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252-55 (1986)) (quotations and emphasis omitted). As recently reiterated by the North Carolina Court of Appeals, the burden on the non-movant goes beyond merely producing some evidence, or a scintilla of evidence, in support of its claims. Rather,

> [i]f the movant meets [its] burden, the nonmovant must take affirmative steps to set forth specific facts showing the existence of a genuine issue of material fact. An adverse party may not rest upon the mere allegations or denials of his pleading. A genuine issue of material fact is one that can be maintained by substantial evidence. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference.

*Khashman v. Khashman*, No. COA16-765, 2017 N.C. App. LEXIS 715, at *15 (Sept. 5, 2017) (citations and quotation marks omitted). In summary, this Court must decide "not whether there is literally no evidence, but whether there is any upon which a

jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Anderson*, 477 U.S. at 251.[3]

### B. Misappropriation of Trade Secrets

24. In its Second Claim for Relief, Plaintiff alleges that Defendants misappropriated Plaintiff's trade secrets in violation of the NCTSPA. (ECF No. 1 at ¶¶ 63–76.) Medero and Scott's Hill seek summary judgment on the claim for misappropriation of trade secrets.

25. Plaintiff alleges that the trade secrets "included current and potential customer information such as customer names and contact information, historical sales data, product pricing, and product preference and usage" and "vendor information." (*Id.* at ¶¶ 65, 66.) Plaintiff has provided no evidence in support of its allegations that Medero and Scott's Hill misappropriated historical sales data, product pricing, product preference and usage, and vendor information. In addition, in response to Defendants' motions for summary judgment, Plaintiff only argues that Medero and Scott's Hill misappropriated Plaintiff's customer names and contact information. (Pl.'s Mem. Opp. Medero's Motion, ECF No. 67 at pp. 8–12.) Accordingly, to the extent Plaintiff alleged that Defendants misappropriated trade secrets other than customer names and contact information, Defendants' motions for summary

---

[3] The Supreme Court of North Carolina has held that "Federal Rule 56 is substantially the same as our Rule 56, and we therefore look to the Federal decisions for guidance in applying our rule." *Singleton v. Stewart*, 280 N.C. 460, 464, 186 S.E.2d 400, 403 (1972); *see also Dendy v. Watkins*, 288 N.C. 447, 452, 219 S.E.2d 214, 217 (1975) ("Federal Rule 56 is substantially the same as Rule 56 of Chapter 1A-1 of the General Statutes and, therefore, it is proper for us to look at the federal decisions and textbooks as well as our own for guidance in applying the rule.").

judgment regarding Plaintiff's claim for misappropriation of trade secrets should be GRANTED.

26.    The NCTSPA defines a "trade secret" as:

> [B]usiness or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
>
> a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and
>
> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

G.S. § 66-152(3). The courts consider the following factors in determining whether information constitutes a trade secret:

> (1) The extent to which [the] information is known outside the business; (2) the extent to which it is known to employees and others involved in the business; (3) the extent of measures taken to guard secrecy of the information; (4) the value of information to business and its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

*Wilmington Star-News, Inc. v. New Hanover Reg'l Med. Ctr., Inc.*, 125 N.C. App. 174, 180–81, 480 S.E.2d 53, 56 (1997).

27.    Plaintiff contends that the names of its customers, combined with the customers' phone numbers or email addresses, is a trade secret. (ECF No. 67 at p. 10.) Plaintiff argues that the combination of customer names and contact information was compiled by Medero for Plaintiff. Plaintiff further argues that the combination

of customer names and contact information has actual commercial value because it is not "readily ascertainable," and it would take significant effort to identify such customers and obtain necessary contact information. (ECF No. 67 at pp. 11–12.) Plaintiff contends that it took reasonable steps under the circumstances to maintain the secrecy of its customer names and contact information. Defendants argue that the identities of customers who purchase the types of products and services Plaintiff sells are not secrets and that those customers' contact information is relatively easy to compile.

28.     With regard to Plaintiff's efforts to maintain the secrecy of its customer names and contact information, Plaintiff required Medero to sign the Employment Agreement and the NDA. The Employment Agreement does not expressly state that customers' names or identities, or contact information, are considered confidential information.  Rather, the Employment Agreement prohibits Medero from disclosing "customer and client lists." (ECF No. 1.4 at §§ 9(a) and (c).) The NDA provides only that Medero will "honor the Employment Agreement" and will not disclose confidential information. (ECF No. 1.4) The NDA does not expressly state that customer names and contact information constitute "confidential information." (*Id.*)

29.     It is undisputed that Plaintiff did not instruct Medero that the identities of his customer names were secrets. (ECF No. 21 at ¶ 7.) Rather, the evidence establishes that the customers for Plaintiff's products are construction contractors who can be identified by visiting construction sites and talking to workers at the sites. (ECF No. 18 at ¶ 15; ECF No. 21 at ¶ 6; ECF No. 23 at ¶ 7; F. Stem Aff., ECF No.

50.7 at ¶ 3; C. Romero Aff., ECF No. 50.12 at ¶ 3.) Significantly, Plaintiff concedes that the existence of its relationships with its customers "is not confidential or proprietary." (ECF No. 67 at p. 10.)

30.    With regard to the contact information for those customers, while the parties agree that traveling to various job sites to obtain phone numbers or email addresses for the customers can be time consuming, Plaintiff has not created a genuine issue of fact that the contract information is not "readily ascertainable." *Area Landscaping, L.L.C. v. Glaxo-Wellcome, Inc.*, 160 N.C. App. 520, 525, 586 S.E.2d 507, 511 (2003) ("[T]o survive a motion for summary judgment, [a plaintiff] must allege facts that would allow a reasonable finder of fact to conclude that the information [at issue] was not 'generally known or readily ascertainable' . . . .") (quoting *Bank Travel Bank v. McCoy*, 802 F. Supp. 1358, 1360 (E.D.N.C. 1992)).

31.    The Court concludes that the undisputed facts establish that the names and contact information of Plaintiff's customers, by themselves, do not constitute trade secrets within the meaning of the NCTSPA. *Bldg. Ctr., Inc. v. Carter Lumber of the North, Inc.*, 2017 NCBC LEXIS 85, at *19-20 (N.C. Super. Ct. Sept. 17, 2017) ("Although customer lists, when compiled with pricing and bidding formulas, can sometimes qualify as a trade secret under the TSPA, the Court does not consider a customer list containing only information that is easily accessible through a telephone book or other readily available sources to be a trade secret."); *UBS PaineWebber, Inc. v. Aiken*, 197 F. Supp. 2d 436, 447–448 (W.D.N.C. 2002) ("[C]ustomer lists" containing "the names and addresses of clients" are not trade

secrets under NCTSPA); *Philips Elecs. N. Am. Corp. v. Hope*, 631 F. Supp. 2d 705, 721 (M.D.N.C. 2009) (North Carolina courts have held that "customer pricing lists, cost information, confidential customer lists, and pricing and bidding formulas may constitute trade secrets . . . [but] have refused to protect customer names and addresses or personal relationships with customers as 'trade secrets'"); *Combs & Assocs. v. Kennedy*, 147 N.C. App. 362, 370, 555 S.E.2d 634, 640 (2001) ("[C]ustomer database stored on [defendant]'s computer" not a trade secret where "defendants could have compiled a similar database through public listings such as trade show and seminar attendance lists"); *Novacare Orthotics & Prosthetics E., Inc. v. Speelman*, 137 N.C. App. 471, 478, 528 S.E.2d 918, 922 (2000) (holding customer lists were not considered "trade secrets" where information would have been easily accessible through a local telephone book); *compare Medical Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 658, 670 S.E.2d 321, 328 (2009) ("[Plaintiff]'s database, which contained [plaintiff]'s nurses' phone numbers, *pay rates, specializations, and preferences regarding shifts and facilities*" constituted trade secret) (emphasis added), *with Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 174 N.C. App. 49, 56, 620 S.E.2d 222, 228 (2005) (holding "customer information (identity, contacts *and requirements of its rental customers*)" constituted trade secrets) (emphasis added). Accordingly, Plaintiff's claims for misappropriation of trade secrets against Medero and Scott's Hill must fail, and Defendants' motions for summary judgment as to the claims for misappropriation of trade secrets should be GRANTED.

### C. Breach of the Employment Agreement and the NDA

32. In its Third Claim for Relief, Plaintiff alleges that Medero breached sections 6(e), (f), and (h) and sections 7(b)(iii) and (iv), and the non-disclosure provisions, of the Employment Agreement. (ECF No. 1 at ¶¶ 79–86.) Plaintiff also alleges that Medero violated the NDA. (*Id*. at ¶¶ 87 and 90.) Medero seeks summary judgment as to all of the claims for breaches of the Employment Agreement and the NDA. Plaintiff cross-moves for partial summary judgment on its claim that Medero breached the non-disclosure provisions of the Employment Agreement.

33. In response to Medero's Motion, Plaintiff has significantly narrowed its claims under the Third Claim for Relief. Plaintiff now is pursuing only its claims that Medero breached sections 6(f) and 7(b)(iv), and the non-disclosure provisions, of the Employment Agreement. (ECF No. 67 at p. 13.) Plaintiff is not pursuing its claims for breach of sections 6(e) or 7(b)(iii) of the Employment Agreement or breach of the NDA. Thus, to the extent Plaintiff alleged that Medero breached any other provisions of the Employment Agreement, or breached the NDA, Medero's motions for summary judgment should be GRANTED.

#### i. Sections 6(f) and 7(b)(iv) of Employment Agreement

34. Plaintiff alleges that Medero breached sections 6(f) and 7(b)(iv) (the "non-competition provisions") of the Employment Agreement by working for Scott's Hill. Sections 6(f) and 7(b)(iv) provide that Medero "will not, either directly or indirectly, compete with the [Plaintiff] . . . [w]ithin a twenty five (25) mile radius of

any customer location where [Medero] performed services for [Plaintiff] or solicited business on behalf of [Plaintiff]." (ECF No. 1.4 at § 6(f).) "Compete" is defined in the Employment Agreement as "engaging in any business that is in competition with Employer in a manner which is competitive with Employer's business" and includes "acting as an individual, consultant, advisor, officer, owner, member, manager, director, shareholder, principal, independent contractor, employee or in any other capacity whatsoever." (*Id.* at §§ 7(b)(iv) and (c).) Medero argues that the non-competition provisions are unenforceable because the time and territory provisions are excessively broad.

35.     Under North Carolina law, a covenant not to compete is valid if it is (1) in writing, (2) made part of the employment contract, (3) based on valuable consideration, (4) reasonable as to time and territory, and (5) designed to protect a legitimate business interest of the employer. *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 402–03, 302 S.E.2d 754, 760 (1983). It is undisputed that the non-competition provisions are in writing and are part of the Employment Agreement, and Medero does not argue that he was not provided consideration for the non-competition provision. Accordingly, the Court must consider the scope of the restriction and whether it protects Plaintiff's legitimate business interests.

36.     In assessing the reasonableness of the time and geographic limitations, North Carolina courts consider the following factors: "(1) the area, or scope, of the restriction; (2) the area assigned to the employee; (3) the area where the employee actually worked or was subject to work; (4) the area in which the employer operated;

(5) the nature of the business involved; and (6) the nature of the employee's duty and his knowledge of the employer's business operation." *Okuma Am. Corp. v. Bowers*, 181 N.C. App. 85, 89, 638 S.E.2d 617, 620 (2007). "[T]he territorial restriction … can be no greater than is reasonably necessary to protect the legitimate business interests of the employer. *Sandhills Home Care, L.L.C. v. Companion Home Care - Unimed, Inc.*, 2016 NCBC LEXIS 61, at *14 (N.C. Super. Ct. Aug. 1, 2016) (citing *Manpower of Guilford County, Inc. v. Hedgecock*, 42 N.C. App. 515, 521, 257 S.E.2d 109, 114 (1979)).

37.     The geographic scope of the non-competition provisions is, at best, difficult to determine. The covenant restricts Medero from competing within 25 miles of any "customer location" where he performed services or solicited sales for Plaintiff. The language appears to be designed to restrict Medero from competing in and around the locations at which Medero called upon customers in the Raleigh area, which consisted of construction job sites. Plaintiff, however, takes the position that the term "customer location" as used in the Employment Agreement means the "business addresses [of the customers] as maintained in Plaintiff's records." (ECF No. 50.2 at Interrog. No. 9.) The evidence establishes that the business addresses maintained by Plaintiff for Medero's customers included, among other locations: Boise, Idaho; Salt Lake City, Utah; Goodyear, Arizona; Jacksonville, Florida; Rockport, Texas; Rising Sun, Maryland; Little Rock, Arkansas; and Stockertown, Pennsylvania. (ECF No. 50.5 at Ex. C.) These are likely the corporate billing addresses of customers doing work in the Raleigh area on whom Medero called to sell

Plaintiff's products. It is undisputed, however, that Medero did no work on behalf of Plaintiff in any of the far-flung locations listed above from which he would be restricted from competing with Plaintiff. Using the business addresses maintained by Plaintiff to determine the geographic areas in which Medero is prohibited from working creates an untenably overbroad geographic scope.

38. Plaintiff does not argue that prohibiting Medero from working in areas like Salt Lake City or Boise, in which Medero performed no services for Plaintiff, serves a legitimate business interest of Plaintiff. Instead, Plaintiff argues:

> [u]sing the customer's business address is, in fact, less restrictive on Medero than using the location where sales may have been made. If the customer's business address lies outside the sales territory Medero serviced for Scott's Hill, it can have no impact on his ability to earn a living and, therefore, cannot be unreasonable.

(ECF No. 67 at p. 15.) Plaintiff appears to contend that restricting Medero from working in Salt Lake City or Boise does not impact his ability to work in the Raleigh area, and those customer locations can be ignored for purposes of determining whether the geographic restrictions are reasonable. Plaintiff does not argue, however, that the Employment Agreement in written in a fashion that would permit the Court to strike, or "blue pencil", the customer locations to permit enforcement only of the restrictions as to customers located in and around Raleigh, North Carolina. *See Beverage Sys. of the Carolinas, LLC v. Associated Bev. Repair, LLC*, 368 N.C. 693, 699, 784 S.E.2d 457, 461 (2016) ("[W]hen an agreement not to compete is found to be unreasonable, we have held that the court is powerless unilaterally to amend the terms of the contract. If the parties have agreed upon territorial limits of competition,

these limits will be enforced 'as written or not at all,' for courts will not carve out reasonable subdivisions of an otherwise overbroad territory."). The Court cannot enforce a covenant not to compete only as to the "reasonable" geographic areas selected by a former employer and ignore those overbroad restrictions that are not reasonably related to its business interests.

39. Read together, sections 6(f) and 7(b)(iv) of the Employment Agreement are overbroad, and the geographic restriction on Medero's employment does not protect Plaintiff's legitimate business interests in maintaining its local customers. *Okuma*, 181 N.C. App. at 89, 638 S.E.2d at 620 ("[T]he scope of the geographic restriction must not be any wider than is necessary to protect the employer's reasonable business interests."). Therefore, Medero's motion for summary judgment as to Plaintiff's claim for breach of the non-competition provisions in the Employment Agreement should be GRANTED.

ii. Non-Disclosure Provisions in Employment Agreement

40. Plaintiff also alleges that Medero breached the non-disclosure provisions in the Employment Agreement by retaining the names and telephone numbers and email addresses of Plaintiff's customers in his personal Yahoo contacts list after his termination, failing to "return" the information to Plaintiff, and using that information to contact customers while working for Scott's Hill. (ECF No. 1 at ¶¶ 84–87.) Medero argues that Plaintiff's "real purpose" behind the non-disclosure provisions is to prohibit Medero from soliciting Plaintiff's customers, and that the non-disclosure provisions should be subject to the same requirements for an

enforceable non-competition agreement. (Medero's Mem. Supp. Medero's Motion, ECF No. 50 at pp. 20–21.) Medero further contends that since the non-disclosure provisions are not bounded by a time limitation, they cannot be enforced. (*Id.* at p. 21.)

41. The North Carolina Court of Appeals has held that "an agreement is not in restraint of trade . . . if it does not seek to prevent a party from engaging in a similar business in competition with the promise, but instead seeks to prevent the disclosure or use of confidential information." *Chemimetals Processing, Inc. v. McEneny*, 124 N.C. App. 194, 197, 476 S.E.2d 374, 376 (1996). Such an agreement is enforceable "even though the agreement is unlimited as to time and area, upon a showing that it protects a legitimate business interest of the promisee." *Id.* at 197, 476 S.E.2d at 376–77 (citation omitted).

42. Plaintiff contends that the non-disclosure provisions are not in restraint of trade, and do not prohibit Medero from contacting or soliciting business from his former Plaintiff's customers. (ECF No. 57 at p. 20.) Rather, Plaintiff claims Medero is only prohibited from looking at the information he retained in his personal Yahoo contact list to find the customers' name and contact information. (*Id.*) In other words, so long as Medero can draw his customers' names and contact information from his memory, or from any source other his personal contacts list, he is not restricted from using that information to contact and solicit those customers.

43. Plaintiff's focus on restricting Medero from using customer names and contact information make this case highly similar to the facts in *AmeriGas Propane,*

*L.P. v. Coffey*, 2015 NCBC LEXIS 98 (N.C. Super. Ct. Oct. 15, 2015). In *Coffey*, the plaintiff Amerigas employed the defendant as a residential propane delivery driver. Coffey executed a Post-Employment Agreement with AmeriGas that contained a "non-disclosure provision." *Id.* at *4–5. The non-disclosure provision required Coffey "to 'protect the Confidential Information of AmeriGas and its predecessors and affiliates from disclosure' and 'not, during or after [his] term of employment, divulge such Confidential Information or use it for the benefit of any person or entity not associated with AmeriGas.'" *Id.* at *5. The Post-Employment Agreement defined Confidential Information to include "information . . . concerning . . . past, present, and prospective customer identities, [and] lists . . . ." *Id.* at *20.[4]   After AmeriGas terminated Coffey, he became employed with another residential propane company and solicited and sold propane to his former AmeriGas customers. *Id.* at *6–8.

44.    AmeriGas sued Coffey and claimed, *inter alia*, that he breached the Post-Employment Agreement by using the identities of his Amerigas customers to solicit the business of those customers. *Id.* at *20. In *Coffey*, the Court concluded that the identities of AmeriGas's residential propane customers could be readily ascertained and that the information was not "confidential in any meaningful sense." *Id.* at *24. The Court therefore concluded that the "intended effect" of an agreement prohibiting the defendant from using the plaintiff's "customer identities" was "to preclude [the defendant] from soliciting [the plaintiffs'] customers." *Id.*

---

[4] AmeriGas maintained its "customer information" in a password-protected database accessible only to a limited number of employees, including Coffey. *Id.* at *6.

45.     As in *Coffey*, in this case Plaintiff's customer names and contact information are readily ascertainable and are not "confidential in any meaningful sense." *Id.* at *24. Customers for the products and services Plaintiff and its competitors provide are identified by visiting construction sites and speaking to contractors. The fact that a contractor is purchasing from a particular supplier, such as Plaintiff, is not a secret. Medero has encountered many of the customers he serviced for Plaintiff merely by traveling to construction job sites for Scott's Hill. (ECF No. 21 at ¶12.)

46.     Because Plaintiff's customer identities and basic contact information is not confidential, the non-disclosure provisions do not serve Plaintiff's legitimate business interests, but rather seek to prevent Medero from soliciting Plaintiff's customers in restraint of trade. The Court concludes the non-disclosure provisions must be construed and analyzed as a restrictive covenant in restraint of trade. *See Coffey*, 2015 NCBC LEXIS at *42; *see also Creative Snacks, Co., LLC v. Hello Delicious Brands LLC*, 2017 U.S. Dist. LEXIS 146993, at *14 (M.D.N.C. Sept. 12, 2017) (applying *Chemimetals* and finding that a purported non-disclosure provision "restrain[ed] [Defendant's] primary business" and was in fact a covenant not to compete).

47.     A covenant preventing competition must be "reasonable as to time and territory." *A.E.P. Indus.*, 308 N.C. at 404, 302 S.E.2d at 761. As a restrictive covenant, prohibiting Medero's use or disclosure of Plaintiff's customer identities is overbroad. The non-disclosure provisions are not limited as to time, but rather are perpetual.

Such a restraint would prevent Medero from ever using the names and contact information of Plaintiff's customers. Insofar as the non-disclosure provisions seek to prevent Medero from soliciting Plaintiff's customers, they constitute an unenforceable restrictive covenant. Accordingly, Plaintiff's motion for summary judgment as to the breach of the non-disclosure provisions is DENIED, and Medero's motion for summary judgment as to the breach of the non-disclosure provision is GRANTED.

### D. Tortious Interference with Contract

48. In its Fifth Claim for Relief, Plaintiff alleges that Scott's Hill intentionally interfered with Medero's Employment Agreement with Plaintiff and with Plaintiff's contracts with its customers. (ECF No. 1 at ¶¶ 95–100.) Scott's Hill moves for summary judgment on the claim for tortious interference with contract.

49. In response to Scott's Hill's Motion Plaintiff has not argued in support of its allegation that Scott's Hill interfered with Plaintiff's contracts with its customers. Accordingly, to the extent Plaintiff alleged that Defendants tortiously interfered with Plaintiff's contracts with its customers, Scott's Hill's motions for summary judgment should be GRANTED.

50. In order to prevail on a claim for tortious interference with contract, a plaintiff must establish that: (1) a valid contract existed between the plaintiff and a third party that conferred upon plaintiff contractual rights against the third party; (2) the defendant was aware of the contract; (3) the defendant intentionally induced the third party not to comply with the contract; (4) the defendant did so without

justification; and (5) actual injury to plaintiff resulted. *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988).

51. The Court already has concluded that the non-competition and non-disclosure provisions in the Employment Agreement are not enforceable. Accordingly, Plaintiff cannot establish the existence of a valid contract between itself and Medero, and Plaintiff's claim that Scott's Hill interfered with the Employment Agreement must fail. *Phelps Staffing, LLC v. C. T. Phelps, Inc.*, 226 N.C. App. 506, 512, 740 S.E.2d 923, 928 (2013) ("Because the noncompetition agreement is unenforceable, the contract cannot support plaintiff's claim for tortious interference with contract, and the trial court did not err in granting summary judgment in favor of defendants on that claim.") Consequently Defendant Scott's Hill's motion for summary judgment as to the claim for tortious interference with contract should be GRANTED.

*E.    Conversion*

52. Plaintiff's sixth cause of action is for conversion. Plaintiff alleges that Medero and Scott's Hill "misappropriated confidential and proprietary business information and trade secrets," including "current and potential customer information such as customer names and contact information, customer buying preferences and history, and product pricing." (ECF No. 1 at ¶¶ 101–110.) Plaintiff's evidence at this stage, however, is limited to customer names and contact information. To the extent Plaintiff has alleged that Defendants converted any other trade secrets or confidential business information, Defendants' motions for summary judgment should be GRANTED.

53. Defendants argue that Plaintiff's claim for conversion of the names and contact information of Plaintiff's customers fails because the undisputed facts show that (1) the customer names and contact information were in an electronically-stored form and therefore cannot be converted, and (2) Medero did not convert the customer names and contact information because he did not exclude Plaintiff from their use. Plaintiff argues that the mere retention of the electronic data is sufficient to constitute conversion, because it interfered with Plaintiff's right to exclusive dominion and control over the information. (Pl.'s Mem. Opp. Scott's Hill's Motion, ECF No. 68 at p. 20.)

54. Under North Carolina law, "conversion is defined as an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Spinks v. Taylor*, 303 N.C. 256, 264, 278 S.E.2d 501, 506 (1981) (quoting *Peed v. Burleson, Inc.*, 244 N.C. 437, 439, 94 S.E.2d 351, 353 (1956)). "The essence of conversion is not the acquisition of property by the wrongdoer, but a wrongful deprivation of it to the owner." *Bartlett Milling Co., L.P. v. Walnut Grove Auction & Realty Co.*, 192 N.C. App. 74, 86, 665 S.E.2d 478, 488 (2008).

55. Plaintiff relies on federal case law to argue that Medero's retention of customer names and contact information in his Yahoo personal contacts "excluded Plaintiff from exercising control over its proprietary information." *Bridgetree, Inc. v. Red F Mktg. LLC*, No. 3:10-cv-00228-FDW-DSC, 2013 U.S. Dist. LEXIS 15372, at *49 (W.D.N.C. Feb. 5, 2013). The *Bridgetree* holding, however, has been expressly rejected

in this Court. *See, e.g., New Friendship Used Clothing Collection, LLC v. Katz,* 2017 NCBC 71 (August 18, 2017) at ¶¶ 77 – 79 (compiling cases).

56. The essential element of a conversion claim, under North Carolina state law, is deprivation to the owner. *See Bartlett Milling Co., L.P.*, 192 N.C. App. at 86, 665 S.E.2d at 488. Therefore, retention by a wrongdoer of an electronic copy in a manner that does not deprive the original owner of access to the same electronic data cannot constitute conversion under current North Carolina law. In the absence of further guidance from the North Carolina Supreme Court or Court of Appeals, the Court declines to construe the law of conversion more broadly. Accordingly, Defendants' Motions as to the claim of conversion are GRANTED.

F. *Unjust Enrichment*

57. The basis for Plaintiff's seventh claim for relief for unjust enrichment is not clear. Plaintiff alleges only that "Defendants obtained benefits from [Plaintiff]" and "[g]iven the nature of the unlawful conduct and circumstances, it would be unjust to allow Defendants to retain those benefits." (ECF No. 1 at ¶¶ 112–113.) Medero and Scott's Hill seek summary judgment on this claim.

58. A claim for unjust enrichment "is neither in tort nor contract but is described as a claim in quasi contract or a contract implied in law." *Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988). "The general rule of unjust enrichment is that where services are rendered and expenditures made by one party to or for the benefit of another, without an express contract to pay, the law will imply a promise to pay a fair compensation therefor." *Atlantic C. L. R. Co. v. State Highway Comm'n,*

268 N.C. 92, 95-96, 150 S.E.2d 70, 73 (1966). In North Carolina, to recover on a claim of unjust enrichment, Plaintiff must prove: (1) that it conferred a benefit on another party; (2) that the other party consciously accepted the benefit; and (3) that the benefit was not conferred gratuitously or by an interference in the affairs of the other party. *Southeastern Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 330, 572 S.E.2d 200, 206 (2002).

59.     Plaintiff does not allege, let alone provide evidence, that it conferred a benefit on Defendants or how the facts in this case would support a claim for a contract implied in law. Rather, Plaintiff merely alleges that Defendants took and used Plaintiff's customer names and contacts and thereby benefitted themselves. These allegations do not support a claim for unjust enrichment. Defendants' motions for summary judgment as to Plaintiff's claim for unjust enrichment should be GRANTED.

### G.     Unfair and Deceptive Trade Practices

60.     In its eighth claim for relief, Plaintiff alleges that the "conduct of the Defendants" as alleged in the Verified Complaint "constitutes unfair and deceptive acts or practices." (ECF No. 1 at ¶ 115–117.) In its briefs, Plaintiff asserts that the "conduct" referenced in the Verified Complaint includes Medero's possession and use of the customer list and Scott's Hill's "misappropriation of Plaintiff's trade secrets, its conversion of Plaintiff's confidential customer information . . . and its tortious interference with Plaintiff's Employment Agreement with Medero." (ECF No. 67 at pp. 25–26; ECF No. 68 at p. 16.)

61. North Carolina General Statute § 75-1.1 declares unlawful any "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." To state a claim under G.S. § 75-1.1, a plaintiff must allege "(1) [that] the defendants committed an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff[] or to the plaintiffs' business." *Birtha v. Stonemor, N.C., LLC*, 220 N.C. App. 286, 298, 727 S.E.2d 1, 10 (2012). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and a practice is deceptive if it has the capacity or tendency to deceive." *Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 91, 747 S.E.2d 220, 228 (2013) (quotation marks omitted). "An act or practice is deceptive if it has the capacity or tendency to deceive." *Ace Chem. Corp. v. DSI Transps.*, 115 N.C. App. 237, 247, 446 S.E.2d 100, 106 (1994) (quotation marks omitted). Unfair competition eludes a precise definition, and whether an act or practice is unfair or deceptive is ultimately a question of law for the Court. *Songwooyarn Trading Co. v. Sox Eleven, Inc.*, 213 N.C. App. 49, 56, 714 S.E.2d 162, 167 (2011).

62. The Court has granted summary judgment against Plaintiff on its claims for misappropriation of trade secrets, breach of contract, tortious interference with contract, civil conspiracy, and conversion. Plaintiff has not alleged or provided evidence of any other conduct that would support a claim that Defendants' engaged in unfair or deceptive practices. *Combs & Assocs. v. Kennedy*, 147 N.C. App. 362, 374,

555 S.E.2d 634, 642 (2001) ("[P]laintiff's claim that defendants engaged in unfair and deceptive trade practices rests with its claims for misappropriation of trade secrets, tortious interference with contracts and civil conspiracy. Having determined that the trial court properly granted summary judgment on each of these claims, we likewise conclude that no claim for unfair and deceptive trade practices exists."). Defendants' motions for summary judgment as to the claim of unfair and deceptive trade practices should be GRANTED.

### H. Conspiracy

63. In its Fourth Claim for Relief, Plaintiff alleges that Medero and Scott's Hill conspired to "diminish the contractual rights of [Plaintiff] under the Employment Agreement," "misappropriate the confidential . . . information and trade secrets of [Plaintiff]" and "compete unfairly with [Plaintiff]." (ECF No. 1 at ¶¶ 91–94.) Defendants have moved for summary judgment on this claim.

64. The elements of a civil conspiracy are: "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." *Bottom v. Bailey*, 238 N.C. App. 202, 212, 767 S.E.2d 883, 890 (2014) (quoting *Strickland v. Hedrick*, 194 N.C. App. 1, 19, 669 S.E.2d 61, 72 (2008)). The agreement to form a conspiracy must be an intention by two or more persons to pursue a common objective, or "a meeting of the minds on the object or course of action [to be accomplished]. . . ." *Dalton v. Camp*, 135 N.C. App. 32, 42, 519 S.E.2d 82, 89 (1999).

65.     "There is not a separate action for civil conspiracy in North Carolina." *Dove v. Harvey*, 168 N.C. App. 687, 690, 608 S.E.2d 798, 800 (2005) "Rather: 'In civil conspiracy, recovery must be on the basis of sufficiently alleged wrongful overt acts. The charge of conspiracy itself does nothing more than associate the defendants together and perhaps liberalize the rules of evidence to the extent that under proper circumstances the acts and conduct of one might be admissible against all.'" *Id.* (citation and quotations omitted).

66.     The Court has granted summary judgment against Plaintiff on its claims for misappropriation of trade secrets, breach of contract, tortious interference with contract, conversion, and unfair and deceptive trade practices. As these were the claims of unlawful conduct underlying Plaintiff's claim for conspiracy, the civil conspiracy claim also must fail. *See Esposito v. Talbert & Bright, Inc.*, 181 N.C. App. 742, 747, 641 S.E.2d 695, 698 (2007) (holding that because summary judgment for defendants on all claims was proper, plaintiff's claim for civil conspiracy must also fail); *Toomer v. Garrett*, 155 N.C. App. 462, 483, 574 S.E.2d 76, 92 (2002) ("Only where there is an underlying claim for unlawful conduct can a plaintiff state a claim for civil conspiracy . . . ."). Accordingly, Medero's and Scott's Hill's motions for summary judgment as to the claim of civil conspiracy should be GRANTED.

I.      *Punitive Damages (Ninth Claim for Relief)*

67.     Plaintiff also alleges a claim for punitive damages as a separate cause of action. (ECF No. 1 at ¶¶ 118–120). Plaintiff alleges that it is entitled to punitive

damages because Defendants' conduct "was and could be nothing other than intentional, willful, wanton, and malicious." (ECF No. 1 at ¶ 119.)

68. "Pursuant to our statutes, punitive damages may be awarded only if a claimant proves that the defendant is liable for compensatory damages and that the defendant is guilty of fraud, malice, or willful or wanton conduct." *Combs & Assocs., Inc.*, 147 N.C. App. at 374, 555 S.E.2d at 642 (citing G.S. § 1D-15(a)). Plaintiff has not proven that either Medero or Scott's Hill is liable for any claim or that Medero or Scott's Hill committed any wrongful fact constituting fraud, malice, or willful or wanton conduct. Accordingly, Defendants' motions for summary judgment as to the claim for punitive damages should be GRANTED.

### J.    *Plaintiff's Request for Permanent Injunction*

69. Since the Court has granted summary judgment for Defendants on all of Plaintiff's claims, there are no claims that would support issuance of a permanent injunction. Accordingly, the Court should GRANT summary judgment in favor of Defendants, and Plaintiff's claim for permanent injunction should be DENIED.

70. THEREFORE, IT IS ORDERED that Scott's Hill's Motion is GRANTED, Plaintiff's Motion is DENIED, and Medero's Motion is GRANTED, and Plaintiff's claims are DISMISSED WITH PREJUDICE.

This the 2nd day of January, 2018.

/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge
    for Complex Business Cases